**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **RUBINA SIDDIQUI and JENNIFER LONGWELL, individually and on behalf of all others similarly situated,**<br><br>*Plaintiff*,<br><br><br>v.<br><br>**ANNE ARUNDEL DERMATOLOGY, PA.**<br><br>*Defendant*s. | Case No.: _____<br><br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs Rubina Siddiqui and Jennifer Longwell, ("Plaintiffs") bring this Class Action Complaint against Anne Arundel Dermatology, PA. ("AAD") as individuals and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiffs' own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

**PARTIES, JURISDICTION & VENUE**

1.     Plaintiff Rubina Siddiqui is a resident of the State of Georgia. Plaintiff Siddiqui resides in Duluth, GA which is located in Gwinnett County. Gwinnett County is located within the Northern District of Georgia.

2.     Plaintiff Siddiqui is a former patient of the Defendant, Anne Arundel Dermatology.

3.     Plaintiff Jennifer Longwell is a resident of the State of Florida. Plaintiff Longwell resides in Tampa, FL which is located in Hillsborough County.

4.      Defendant Anne Arundel Dermatology, PA. boasts having one of the largest dermatology practices in the Mid-Atlantic and Southeastern United States[1].

5.      Defendant Anne Arundel Dermatology, PA. has its principal place of business in Annapolis, Maryland but has multiple locations in the following states: Florida, Georgia, Maryland, North Carolina, Pennsylvania, Tennessee and Virginia. Its Registered Agent is CT-Trust Incorporated located at 2405 York, Rd, Suite 201, Lutherville Timonium, MD 21093.

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.§1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from each Defendant.

7.      This Court has personal jurisdiction over Defendant AAD because the Defendant has multiple locations both within the State of Georgia and within this District. AAD has locations within the following cities within the Northern District of Georgia: Buford, Cumming, Duluth, LaGrange, Marietta, Newnan and Suwanee[2]. As such, Defendant AAD has purposefully availed itself of the laws, rights, and benefits of the State of Georgia.

8.      Venue is proper under 28 U.S.C §1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## **FACTUAL ALLEGATIONS**

---

[1] https://aadermatology.com/ (Last Accessed 07/28/2025)
[2] https://aadermatology.com/georgia/ (Last Accessed 07/28/2025)

9.      Plaintiffs and Class Members (later defined) are current and former patients of Defendant.

10.      In a July 11, 2025, letter to the Attorney General of Vermont, AAD advised that a third party gained unauthorized access to "certain", but unidentified, "systems" and believed the unauthorized party did so from February 14, 2025, through May 13, 2025[3].

11.      The same letter advises that PII may have been compromised.

12.      The scope of this data breach is believed to have impacted 1.9 million people throughout the United States[4].

13.      AAD recognizes it has a duty to protect PII on its website: "**WE HAVE A LEGAL DUTY TO SAFEGUARD YOUR PROTECTED HEALTH INFORMATION (PHI)**

Anne Arundel Dermatology, its covered entity practice sites, and other affiliated entities are legally required to protect the privacy of your health information.  We call this information "protected health information" or "PHI" for short. PHI is information that can be used to identify you, which has been created or received about your past, present, or future health or condition, the provision of healthcare to you, or the payment for this health care.[5]"

14.      AAD sent notification letters to both named plaintiffs.  In each letter, it was advised that certain personal and health information may have been compromised: "From the review, we determined on June 27, 2025, that the personal or health information affected may include your date of birth, patient ID, medical record number, health history, financial information, insurance information, and appointment history."

---

[3] https://ago.vermont.gov/sites/ago/files/documents/2025-07-
11%20Anne%20Arundel%20Dermatology%20Data%20Breach%20Notice%20to%20Consumers.pdf
[4] https://www.securityweek.com/anne-arundel-dermatology-data-breach-impacts-1-9-million-people/ (Last Accessed 07/28/2025)
[5] https://aadermatology.com/hipaa-privacy-notice/ (Last Accessed 07/28/205)

15.     Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard the protected health information ("PHI") and other personally identifiable information ("PII") of its patients, including, but not limited to: names, addresses, dates of birth, Social Security numbers, clinical information (service locations, physicians' names, discharge dates, diagnosis, and billing codes) and financial account information.

16.     Medical records represent the most sensitive information available concerning a person's private affairs. These records reveal intimate and personal aspects of the human condition, such as illnesses that might carry social stigma and details about substance abuse, family planning and mental health. Congress has passed legislation under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") in order to protect this highly confidential data, because in the wrong hands, bad actors may target and exploit the most sensitive and vulnerable populations among the public.

17.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' data was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the information from those risks left the data in a dangerous condition.

18.     The Data Breach was a direct result of Defendant's failure to implement reasonable safeguards to protect PHI/PII from a foreseeable and preventable risk of unauthorized disclosure. Had Defendant implemented administrative, technical, and physical controls consistent with industry standards and best practices, it could have prevented the Data Breach.

19.     Defendant's conduct resulted in the unauthorized disclosure of Plaintiffs' private information to cybercriminals. The forgoing harms are directly traceable to the Defendant's failure to adequately secure the PHI/PII in its custody, and has resulted in actual, particularized, and

concrete harm to the Plaintiff.  Plaintiff suffered actual injury in the form of damages to and diminution in the value of the PHI/PII that was compromised in the Data Breach. The injuries Plaintiff suffered, as described herein, can be redressed by a favorable decision in this matter.

20.    Defendant has not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendant has modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

21.    In 2024, the US Department of Health and Human Services Office for Civil Rights (HHS OCR), was notified of about 720 incidents between January 1, 2024, and December 31, 2024, which accounted for roughly 186 million user records that were compromised in data breaches. Roughly 89% of those data breaches affected healthcare providers and business associates.[6]  These numbers are on par with data breach statistics in healthcare from 2023 where the Office of Civil Rights reported 725 notifications of breaches, where more than 133 million records were exposed or impermissibly disclosed.[7]

22.    Defendant's conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation. The imminent risk of future harm resulting from the Data Breach is traceable to the Defendant's failure to adequately secure the PHI/PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiff.

23.    Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit a variety of crimes including, opening new financial accounts, taking out loans, using Plaintiffs' information to obtain government benefits, file

---

[6] https://www.securityweek.com/2024-us-healthcare-data-breaches-585-incidents-180-million-compromised-user-records/
[7] *Healthcare fraud and the burden of medical ID theft*, available at:
https://www.experian.com/blogs/healthcare/healthcare-fraud-and-the-burden-of-medical-id-theft/

fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

24.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [8] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[9]

25.     The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[10]

26.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[11] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[12]

---

[8] *See*, https://www.ssa.gov/phila/ProtectingSSNs.htm.
[9] *Id.*
[10] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[11] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[12] *See* https://www.investopedia.com/terms/s/ssn.asp

27.     Note, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

28.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

29.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number

---

[13] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.")

30.     Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[14]

31.     More specifically, the exposure to the substantial risk of future exploitation caused Plaintiffs and Class Members to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiff and Class Members suffered can be redressed by a favorable decision in this matter.

32.     As a result of the Data Breach, Plaintiffs suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PHI/PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under each Defendant's

---

[14] *See* https://oag.ca.gov/idtheft/facts/your-ssn

possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the data.

33.     Defendant AAD is covered by HIPAA (*see* 45 C.F.R. §160.102) and as such is required to comply with the HIPAA Privacy Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

34.     The HIPAA Privacy Rule and Security Rule establishes standards for the protection of protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a covered entity. *See* 45 C.F.R. § 160.103.

35.     The Privacy Rule requires Defendant to implement appropriate safeguards to protect the privacy of protected health information. The Security Rule requires Defendant to implement appropriate administrative, physical and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. The HIPAA rules also require Defendant to provide notice of an unauthorized disclosure of unencrypted protected health information, without unreasonable delay and in no case later than 60 calendar days after discovery of a breach.

36.     In the course of their relationship, Defendant collected or created PHI/PII related to Plaintiffs and Class Members. As such, Defendant was obligated to use reasonable technical, administrative, and physical safeguards to protect the PHI/PII in its custody.  These obligations were contained in the applicable privacy policy, contract, and other statutory privacy requirements.

37.     Plaintiffs and the Class Members relied on Defendant to keep their PHI/PII confidential, securely maintained, and to make only authorized disclosures of this information.

### *Data Breaches Are Avoidable*

38.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the data from those risks left the data in a dangerous condition.

39.     Upon information and belief, the Data Breach was a direct result of the Defendant's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to their published privacy practices; (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of PHI/PII; and/or (iv) ensure third-party vendors were required to implement reasonable data protection measures consistent with their data protection obligations.

40.     The Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), has issued guidance documents regarding compliance with the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule.[15]

---

[15] *See*, U.S. Department of Health & Human Services, Security Rule Guidance Material, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html

41.     To detect and prevent cyber-attacks, Defendant could and should have implemented administrative, physical, and technical safeguards including, but not limited to, the following:

Administrative Safeguards

    a.  Implement policies and procedures to prevent, detect, contain, and correct security violations.

    b.  Conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic protected health information held by the Defendant.

    c.  Implement security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level.

    d.  Apply appropriate sanctions against employees who fail to comply with the Defendant's security policies and procedures.

    e.  Implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports.

    f.  Identify a security official who is responsible for the development and implementation of the Defendant's policies and procedures to prevent, detect, contain, and correct security violations.

    g.  Implement procedures: (i) for the authorization and/or supervision of employees who work with electronic protected health information or in locations where it might be accessed; (ii) to determine whether an employee's access to electronic protected health information is appropriate; and (iii) for terminating access to electronic protected health information when the employment of, or other arrangement with, a workforce member ends.

    h.  Implement policies and procedures that, based upon the Defendant's access authorization policies, establish, document, review, and modify a user's right of access to a workstation, transaction, program, or process.

    i.  Implement a security awareness and training program for all members of Defendant's workforce, including procedures for guarding against, detecting, and reporting malicious software.

    j.  Implement policies and procedures to address how the Defendant will identify and respond to suspected or known security incidents; mitigate, to the extent practicable, known harmful effects of security incidents; and document security incidents and their outcomes.

    k.  Establish (and implement as needed) policies and procedures for responding to an emergency or other occurrence that damages systems that contain electronic protected health information.

l.  Perform a periodic technical and nontechnical evaluation in response to environmental or operational changes affecting the security of electronic protected health information.

m.  Contractually obtain satisfactory assurances that business associates will appropriately safeguard electronic protected health information.

n.  Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

o.  Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

p.  Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

## Physical Safeguards

q.  Implement policies and procedures to limit physical access to its electronic information systems and the facility or facilities in which they are housed, while ensuring that properly authorized access is allowed.

r.  Implement policies and procedures that specify the proper functions to be performed, the manner in which those functions are to be performed, and the physical attributes of the surroundings of a specific workstation or class of workstation that can access electronic protected health information.

s.  Implement policies and procedures that govern the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items within the facility.

## Technical Safeguards

t.  Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights.

u.  Implement electronic procedures that terminate an electronic session after a predetermined time of inactivity.

v.  Implement a mechanism to encrypt and decrypt electronic protected health information.

w.  Implement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health information.

x.  Implement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed.

y.  Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

z.  Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

aa. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

bb. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

cc. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

dd. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

ee. Configure firewalls to block access to known malicious IP addresses.

ff. Set anti-virus and anti-malware programs to conduct regular scans automatically.

gg. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

hh. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

ii. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

jj. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

kk. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

ll. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

mm. Execute operating system environments or specific programs in a virtualized environment.

nn. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

oo. Conduct an annual penetration test and vulnerability assessment.

pp. Secure your backups.[16]

qq. Identify the computers or servers where sensitive personal information is stored.

rr. Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

ss. Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

tt. Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

uu. Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

vv. Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

ww. To detect network breaches when they occur, consider using an intrusion detection system.

xx. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[17]

42.     Given that Defendant collected, used, and stored PHI/PII, Defendant could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

43.     Without identifying the potential risks to the personal data in Defendant's possession, Defendant could not identify and implement the necessary measures to detect and prevent cyberattacks. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of Plaintiffs and the Class Members' PHI/PII.

---

[16] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view .

[17] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business .

44.     Defendant knew and understood unencrypted PHI/PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PHI/PII and of the foreseeable consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiffs and the Class Members as a result.

### Plaintiffs and Class Members Sustained Damages in the Data Breach

45.     Plaintiffs sustained damages as a result of this Data Breach. As a further consequence of this Data Breach, Plaintiffs have lost time investigating and responding to the Data Breach.

46.     Plaintiffs seek to recover all out-of-pocket losses, compensation for the time spent dealing with issues arising from the Data Breach, and at least three years of identity theft/fraud protection and spam-blocking to help detect, prevent, and/or remediate potential identity theft and fraud.

47.     The invasion of the Plaintiffs and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendant's conduct. As a consequence of the Data Breach, Plaintiffs and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

48.     Additionally, Plaintiffs and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their PII/PHI was targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to each Defendant's conduct.

49.     Furthermore, Plaintiffs and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to each Defendant's conduct.

50.     Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[18] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

51.     Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the categories of data typically involved in these type of data breaches, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed, or will be placed, on the dark web, it is reasonable for Plaintiff and the Class Members to assume that their PHI/PII was obtained by, or released to, criminals intending to utilize the data for future identity theft-related crimes or exploitation attempts.

52.     The substantial risk of future identity theft, fraud, or other exploitation that Plaintiffs and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiffs and

---

[18] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

53.     For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[19]

54.     As a consequence of the Data Breach, Plaintiffs and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

55.     As a result of the Data Breach, Plaintiffs and Class Members' PHI/PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PHI/PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

---

[19] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

56.     Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[20] Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[21] Sensitive PII can sell for as much as $363 per record.[22] Further, a stolen medical identity has a $50 value on the black market.[23]

57.     Furthermore, Defendants' poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. By transacting business with Plaintiffs and Class Members, collecting their PHI/PII, and then permitting the unauthorized disclosure of the information, Plaintiff and Class Members were deprived of the benefit of their bargain.

58.     When agreeing to pay Defendants for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendants did not invest the funds into implementing reasonable data security practices. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

59.     Through this Complaint, Plaintiffs seek redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

## CLASS ALLEGATIONS

60.     Plaintiffs bring this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

---

[20] *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[21] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/
[22] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[23] Study: Few Aware of Medical Identity Theft Risk, Claims Journal (June 14, 2012), https://www.claimsjournal.com/news/national/2012/06/14/208510.htm

61.     The Class that Plaintiffs seeks to represent is defined as follows:

**Nationwide Class:** All individuals residing in the United States whose PHI/PII was acquired by an unauthorized party as a result of a data breach that occurred between February 14, 2025 and May 13, 2025, as reported by Defendant (the "Class" or "Class Members.").

62.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

63.     Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

64.     Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although, the exact number of Class Members is unknown to Plaintiff at this time, and such number is exclusively in the possession of Defendant, news reports suggest a potential class size of 1.9 million people.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, includes the following:

   a.   Whether and to what extent Defendant had a duty to protect the PHI/PII of Plaintiffs and Class Members;
   b.   Whether Defendant had a duty not to disclose the PHI/PII of Plaintiffs and Class Members to unauthorized third parties;
   c.   Whether Defendant failed to adequately safeguard the PHI/PII of Plaintiffs and Class Members;

d. Whether Defendant AAD required its third-party vendors to adequately safeguard the PHI/PII of Plaintiffs and Class Members;

e. When Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PHI/PII had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PHI/PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of each Defendant's wrongful conduct;

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

66. <u>Typicality</u>: Plaintiffs' claims are typical of those of the other members of the Classes because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

67. <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on each Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

68. <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or

adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

69.   Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

70.   The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

71.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

72.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

73.     Unless a Class-wide injunction is issued, Defendant may continue in the failure to properly secure the PHI/PII of Classes, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

74.     Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

75.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, sharing, storing, and safeguarding their PHI/PII;

    b.  Whether Defendant's security measures to protect its network were reasonable in light of industry best practices;

    c.  Whether Defendant's failure to institute adequate data protection measures amounted to negligence;

    d.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer PHI/PII;

    e.  Whether Defendant made false representations about their data privacy practices and commitment to the security and confidentiality of personal information; and

    f.  Whether adherence to HIPAA rules and/or other data privacy recommendations and best practices would have prevented the Data Breach.

## CAUSES OF ACTION

### COUNT 1: NEGLIGENCE/WANTONNESS

76.     Plaintiffs re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

77.     While providing a health care service, Defendant AAD collects, creates, or shares information about Plaintiffs and Class Members' health status, provision of health care, or payment for health care that can be used to identify Plaintiffs and Class Members.

78.     Plaintiffs and Class Members entrusted Defendant AAD with their PHI/PII with the understanding that Defendant would adequately safeguard their information.

79.     Defendant AAD had full knowledge of the types of PHI/PII it collected and the types of harm that Plaintiffs and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

80.     By collecting, storing, sharing, and using the Plaintiffs and Class Members' PHI/PII, Defendant AAD assumed a duty to use reasonable means to safeguard the personal data it obtained.

81.     Defendant AAD's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors to adhere to the requirements of Defendant AAD's privacy policy; (iii) complied with applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach event.

82.     Defendant AAD is a covered entity, as defined by HIPAA and, as such is required to comply with the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A, C, and E. Under these rules, Defendant had a duty to implement reasonable and appropriate safeguards for the protected health information under its control.

83.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires Defendant to provide notification no later than 60 calendar days after the discovery of an unauthorized disclosure of unencrypted protected health information. Defendant had a duty to notify Plaintiffs and the Class of the Data Breach promptly and adequately. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

84.     Defendant breached its duties under HIPAA by failing to conduct regular privacy assessments and security audits; failing to implement reasonable safeguards; and/or failing to timely notify Plaintiff and Class Members of the Data Breach.

85.     .

86.     Defendant breached its duties, and thus was negligent/wanton. The specific negligent/wanton acts and omissions committed by Defendant includes, but are not limited to, the following:

    a.  Failing to conduct an assessment to determine foreseeable risks and threats – internal and external – to the confidentiality, availability, and integrity of health information.

    b.  Failing to design and implement safeguards to control the risks identified through the risk assessment.

    c.  Failing to encrypt personally identifying information in transit and at rest.

d. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

a. Failing to adequately oversee its vendors with access to PHI/PII.

b. Allowing unauthorized access to PHI/PII.

c. Failing to detect in a timely manner that PHI/PII had been compromised.

d. Failing to destroy or delete PHI/PII it was no longer required to retain.

e. Failing to certify that its vendors deleted PHI/PII they were no longer required to retain.

f. Failing to timely and adequately notify Plaintiffs and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

g. Failing to implement data security practices consistent with Defendant's published privacy policies.

87. Plaintiffs and Class Members were within the class of persons HIPAA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

88. The injuries resulting to Plaintiffs and the Classes because of Defendant's failure to use adequate security measures was reasonably foreseeable.

89. Plaintiffs and the Classes were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PHI/PII and the critical importance of protecting that data.

90. Plaintiffs and the Classes had no ability to protect the PHI/PII in Defendant's possession. Defendant was in the best position to protect against the harms suffered by Plaintiff and the Classes as a result of the Data Breach.

91. But for Defendant's breach of duties owed to Plaintiffs and the Class, their PHI/PII would not have been compromised. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the PHI/PII of Plaintiffs and the Classes and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.

92.     As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PHI/PII; (iii) lost or diminished value of PHI/PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including cancelled or rescheduled medical procedures and appointments; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PHI/PII.

93.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

94.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

## COUNT 2: BREACH OF IMPLIED CONTRACT

95.     Plaintiffs re-allege and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

96.     Defendant creates or collects PHI/PII in the ordinary course of providing products or services.

97.     Defendant established a privacy policy to govern how Defendant collects, uses, shares, and protects the information Defendant gathers in connection with the provision of healthcare services.

98.     In so doing, Plaintiffs and Class Members entered implied contracts with Defendant by which Defendant agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

99.     Plaintiffs and Class Members would not have entrusted their PHI/PII to Defendant in the absence of an expressed or implied promise to implement reasonable data protection measures.

100.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

101.    Defendant breached the implied contract with Plaintiff and Class Members which arose from the course of conduct between the parties, as well as disclosures on the Defendant's web site, privacy policy, and in other documents, all of which created a reasonable expectation that the personal information Defendant collected would be adequately protected and that the Defendant would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

102.    As a direct and proximate result of the Defendant's breach of an implied contract, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PHI/PII; (iii) lost or diminished value of PHI/PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including cancelled or rescheduled medical procedures and appointments; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b)

remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PHI/PII.

103. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

**COUNT 3: UNJUST ENRICHMENT**

104. Plaintiffs re-allege and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

105. Plaintiffs brings this Count in the alternative to the breach of implied contract count above.

106. By obtaining medical treatment and other healthcare related services, Plaintiffs and Class Members conferred a monetary benefit on Defendant. During the course of this relationship, Defendant collected and/or created PHI/PII regarding Plaintiffs and Class Members. Defendant knew that Plaintiff and Class Members conferred a benefit upon them and have accepted and retained that benefit.

107. By collecting the PII, Defendant was obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been compromised or stolen.

108. Defendant failed to secure Plaintiffs and Class Members' PII and, therefore, it would be unjust for Defendant to retain any of the benefits that Plaintiffs and Class Members conferred upon Defendant without paying value in return.

109.    As a direct and proximate result of the Defendant's conduct, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including cancelled or rescheduled medical procedures and appointments; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

110.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

### COUNT 4: INVASION OF PRIVACY

111.    Plaintiffs re-allege and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

112.    Plaintiffs and Class Members had a legitimate expectation of privacy in their protected health information and other personally identifying information such as Social Security numbers and financial information. Plaintiffs and Class Members were entitled to the protection of this information from disclosure to unauthorized third parties.

113.    Defendant owed a duty to Plaintiffs and Class Members to keep their PHI/PII confidential.

114.    Defendant permitted the public disclosure of Plaintiffs and Class Members' PHI/PII to unauthorized third parties.

115.    The PHI/PII that was disclosed without the Plaintiffs and Class Members' authorization was highly sensitive, private, and confidential. The public disclosure of the type of PHI/PII at issue here would be highly offensive to a reasonable person of ordinary sensibilities.

116.    By permitting the unauthorized disclosure, Defendant acted with reckless disregard for the Plaintiffs and Class Members' privacy, and with knowledge that such disclosure would be highly offensive to a reasonable person. Furthermore, the disclosure of the PHI/PII at issue was not newsworthy or of any service to the public interest.

117.     Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized disclosure of Plaintiffs and Class Members' data.

118.    Defendant acted with such reckless disregard as to the safety of Plaintiffs and Class Members' PHI/PII to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiffs and Class Members.

119.    Plaintiffs and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

### COUNT 5: UNFAIR OR DECEPTIVE ACTS OR PRACTICES

120.    Plaintiffs re-allege and incorporates by reference the paragraphs above as if fully set forth herein.

121.    Plaintiffs and Class Members are consumers of Defendant's services. Defendant requires its customers, including Plaintiffs and Class Members, to submit PII/PHI in the ordinary course of providing products or services.

122.    Defendant gathered and stored the PII/PHI of Plaintiffs and Class Members as part of its business of soliciting its services to customers. Plaintiffs and Class Members entrusted Defendant with their PII/PHI with the understanding that Defendant would adequately safeguard

their information.

123.    Under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce. Deceptive practices, as interpreted by the FTC, include failing to adhere to a company's own published privacy policies. Such behavior by Defendant also constitutes a false, misleading, or deceptive act under state consumer protection statutes like Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. §10-1-370 *et seq*.

124.    Defendant violated the state consumer protection statute by failing to adhere to its own privacy policy regarding the confidentiality and security of Plaintiffs and Class Members' information. Defendant further violated the state consumer protection statute by failing to use reasonable measures to protect PII.

125.    Defendant's conduct created a likelihood of confusion or misunderstanding regarding its actual data privacy and security practices. Defendant promised to protect Plaintiffs and Class Members' PII/PHI via its privacy policies, but allowed the unauthorized access to this personal and protected health information; Defendant failed to disclose material facts that the Plaintiffs and Class Members' PII/PHI would be disclosed to unauthorized third parties; Defendant failed to obtain Plaintiffs and Class Members' consent in transmitting their PII/PHI to a third party; and knowingly violated industry and legal standards regarding the protection of Plaintiff and Class Members' PII/PHI.

126.    Defendant's unfair or deceptive acts affected public interests, including those of Plaintiffs and Class Members. Defendant knew or should have known that it was likely to mislead its customers who were acting reasonably. Defendant engaged in unfair or deceptive practices by breaching its duties to provide technical and organizational data security policies, procedures,

and practices. Defendant's failure to adhere to its published privacy policies and procedures is offensive to established public policy and is substantially injurious to consumers as evidenced by the massive Data Breach.

127.    Had Plaintiffs and Class Members known Defendant would not follow its own published security practices they would not have purchased (or continued to purchase) Defendant's products or services. Defendant's deceptive acts, as described herein, proximately caused Plaintiffs and Class Members damages.

128.    As a direct and proximate result of the Defendant's conduct, Plaintiffs and Class Members suffered damages including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) mitigation costs and expenses; and (v) attorneys' fees and court costs.

129.    Plaintiffs allege that Defendant's data security measures remain inadequate. Plaintiff swill continue to suffer injury as a result of the compromise of their PHI/PII and remain at imminent risk that further compromises of their PHI/PII will occur in the future.

130.    Plaintiffs and Class Members have suffered irreparable injury, and will continue to suffer injury in the future, as a result of Defendant's deceptive trade practices, which places Plaintiff sand Class Members at imminent risk that further compromises of their PII will occur in the future. As such, the remedies available at law are inadequate to compensate for that injury. Accordingly, Plaintiffs and Class Members also seek to obtain a judgment declaring, among other things, the following:

     a.    Defendant continues to owe a legal duty to secure PHI/PII and to timely notify consumers of a data breach under the common law, HIPAA, Section 5 of the FTC Act, and various state statutes.

b.  Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs and Class Members' PHI/PII.

131.    The Court also should issue corresponding prospective injunctive relief requiring that Defendant employs adequate data protection practices consistent with law and industry standards.

132.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiffs will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

133.    The issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging Defendant to take necessary action to prevent another data breach, thus eliminating the additional injuries that would result to Plaintiffs and the multitude of individuals whose PII would be at risk of future unauthorized disclosures.

134.    As a result of the Defendant's false, misleading, or deceptive acts, regarding its data security practices, the consuming public in general, Plaintiffs, and Class Members suffered injuries including, but not limited to, the future and continued risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

135.    Plaintiffs and Class Members are entitled to attorneys' fees, costs, and injunctive

relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) implement strong authentication mechanisms for accessing cloud services; and (iii) to provide adequate dark web monitoring and/or credit monitoring to all affected by the Data Breach.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the other members of the Classes alleged herein, respectfully requests that the Court enter judgment as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Class and counsel for Plaintiffs as Class Counsel;

B. For an order declaring the Defendant's conduct violates the statues and causes of action referenced herein;

C. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D. Ordering Defendant to pay for adequate credit monitoring and dark web scanning services for Plaintiffs and the Classes;

E. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendants' conduct;

H. For injunctive relief as pleaded or as the Court may deem proper; and

I. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J. Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: July 29, 2025.                    Respectfully Submitted,

                                         **POULIN | WILLEY |**
                                         **ANASTOPOULO, LLC**

                                         */s/ André R. Bélanger*

                                         André R. Bélanger (GA. Bar. No: 216527)
                                         32 Ann Street
                                         Charleston, SC 29403
                                         Telephone: (803) 222-2222
                                         Fax: (843) 494-5536
                                         Email:
                                         andre.belanger@poulinwilley.com
                                           cmad@poulinwilley.com